# EXHIBIT B



**RIKER
DANZIG
SCHERER
HYLAND
PERRETTI**LLP

ATTORNEYS AT LAW

Michael R. O'Donnell
Partner

<u>Direct:</u>
t: 973.451.8476
f: 973.451.8700
modonnell@riker.com
Reply to: Morristown

December 15, 2006

**VIA FACSIMILE: 602-532-7813 &
EMAIL (greg@crane.net)**
Greg Crane
Michael Taylor
Skyland Investments LLC

**VIA FACSIMILE (760-294-6285) &
EMAIL (s.laskero@cox.net)**
Steven Laskero
Trinity Trust Investment Group

Re:    Potential Assignment of Mortgage Between Sky Land Investments, LLC and
       TTIG, LLC and/or TTIG, LLC's Assignee on the "Property" Located at
       41-81 Clark Road, Bernardsville, New Jersey

Dear Messrs. Crane, Taylor and Laskero:

As you know, I represent Chicago Title Insurance Company as to an ongoing
investigation relating to title matters involving properties of Peter and Lorraine
Mocco and any liens and encumbrances put on those lands by certain First
Connecticut entities. In Mr. Crane's e-mail yesterday to Ms. Donna Sullivan of
Chicago Title Insurance Company ("Chicago Title"), he indicated that "Chicago
Title is simply to act as an [escrow] agent and to update the fully assignable
current policy to reflect the new named insured [TTIG, LLC]" regarding the
above-referenced assignment of mortgage. That title policy, however, cannot be
assigned to the proposed new named insured, TTIG, LLC, without TTIG, LLC
first being made expressly aware of the claims asserted by (i) EMP Whole Loan I,
LLC, namely that it holds a mortgage on the Property as set forth in its
November 29, 2006 letter (annexed hereto as Exhibit 1) and (ii) Lorraine and
Peter Mocco in the matter pending in the Superior Court of New Jersey
consolidated under <u>Titan Management L.P., et al. v. James J. Licata, et al.</u>, Docket
No. ESX-C-280-98, wherein the Moccos have filed a recent motion seeking to
add SWJ Holdings LLC ("SWJ") to the litigation and to divest James Licata,

Headquarters Plaza, One Speedwell Avenue, Morristown, NJ 07962-1981 • t: 973.538.0800 f: 973.538.1984
50 West State Street, Suite 1010, Trenton, NJ 08608-1220 • t: 609.396.2121 f: 609.396.4578
500 Fifth Avenue, Suite 4920, New York, NY 10110 • t: 212.302.6574 f: 212.302.6628
www.riker.com

Gregg Crane
Michael Taylor
Steven Laskero
December 15, 2006
Page 2

Cynthia Licata, SWJ, and the First Connecticut entities of any interest in the Moccos' properties (the Moccos' Notice of Motion is annexed hereto as Exhibit 2). It is our understanding that the Moccos are contending that the First Connecticut entities were not the owners of the properties or proper lienholders. As a result of the Moccos' motion, the Court has issued an order (annexed hereto as Exhibit 3) permitting the Moccos' to seek leave to amend their Complaint to add parties and restraining the alienation, selling, transferring, and encumbering of various entities and properties, including the Property. To our knowledge, said motion for leave to amend has not been filed yet. Finally, both Skyland and TTIG should be aware of the recent decisions and orders of the United States Bankruptcy Court of the District of Vermont and the United States District Court of Vermont on the Moccos' motions to dismiss the First Connecticut bankruptcies (said Opinions annexed hereto as Exhibits 4 and 5). These Orders are part of the Licata Bankruptcy and are, accordingly, decisions or orders of the Court referred to in Exclusion Nine of Schedule B, Part I of the Title Policy.

You should also be aware that while EMP Whole Loan I, LLC is not reflected on the chain of title in the Mortgage, the Vermont Bankruptcy Court and District Court discuss EMP's role in the Mocco/First Connecticut transactions in their Opinions and you should be guided accordingly.

In light of the existing claims, any updating and assignment of the mortgage policy to TTIG, LLC and/or TTIG, LLC's Assignee will be subject to an additional endorsement adding to Schedule B, Part I the following item numbers: (11) the regularity of all terms, conditions, decisions, orders, etc. of the Superior Court of New Jersey in the matters consolidated under <u>Titan Management L.P., et al. v. James J. Licata, et al.,</u> Docket No. ESX-C-280-98; (12) the rights, claims, interests, etc. of EMP Whole Loan I, LLC as to an interest in the mortgage being assigned to TTIG, LLC and/or TTIG, LLC's Assignee or a preexisting mortgage; and (13) any claim by Lorraine Mocco, Peter Mocco or their related or affiliated entities that First Connecticut Consulting Group, Inc. ("First Connecticut"), James Licata or Cynthia Licata had no ownership interest in the Mortgage other than nominal interest and that any subsequent transfer of the Mortgage by First

Gregg Crane
Michael Taylor
Steven Laskero
December 15, 2006
Page 3


Connecticut, James Licata, Cynthia Licata, or any subsequent holder of the Mortgage should be deemed null and void and/or a fraudulent conveyance.

Very truly yours,

Michael R. O'Donnell

cc:      Sharon M. Buscher-Tuttle (via email buschertutles@ctt.com)
         Tammy Meruin (via email tammy.meruin@ctt.com)


3715860.2

# Exhibit 1

LAW OFFICES

# PELINO & LENTZ

A PENNSYLVANIA PROFESSIONAL CORPORATION

76 E. EUCLID AVENUE

SUITE 103

HADDONFIELD, NJ 08033-2339

856-428-9484

FAX 856-425-7533

JOHN W. PELINO
MARTIN R. LENTZ
SALVATORE M. DEBUNDA
BARRY H. FRANK
HOWARD L. SLOT
KENNETH J. LEVIN
LOUIS J. SINATRA
ALAN R. GORDON
HOWARD A. ROSENTHAL
VICTORIA RAGGWOOTEN
JAY S. RUDER*
MARTHA M. HUNT
GARY D. FRY*
EDWARD L. CIENNIECKI*
PAUL R. FITZMAURICE*
JILL W. SELLAK
WAYNE STREIBICH*
PATRICK J. DORAN*
NANCY L. WASCH
JAMES L. RAY
MICHAEL D. ALLEN
JAMES S. AZADI
ALBERT V. FOSTER, JR.
MALCOLM S. GOULD*
KEVIN C. MAKOWSKI*
LISA ANNE SABATINO*
DASHIRA R. WELLINGTON*
NANCY G. BURDINE*

*ALSO MEMBER NJ & PA BARS
OTHER ATTORNEYS NOT ADMITTED IN NJ
‡NJ MANAGING ATTORNEY

OF COUNSEL
ELLIOT UNTERBERGER
JOHN J. TAYLOR

HENRY W. MAXMIN
(1975-1990)

ONE LIBERTY PLACE
THIRTY-SECOND FLOOR
1650 MARKET STREET
PHILADELPHIA, PA 19103-7393
215-665-1540
FAX 215-665-1536

DIRECT DIAL (856) 425-9484
E-MAIL jdruder@pelino-nj.com
website: www.pelino.com

5554.00.039

November 29, 2006

Matthew E. Moloshok, Esquire
Hellring, Lindeman, Goldstein & Siegal, LLP
One Gateway Center
Newark, NJ 07102-5386

Re:   EMP Whole Loan I LLC Mortgage on 41 and 81 Clark Road,
Bernardsville, New Jersey

Dear Mr. Moloshok:

In response to your question, please allow this letter to confirm that EMP Whole Loan I LLC has not sold, assigned or otherwise transferred its interest in the mortgage on the above-referenced properties.

Very truly yours,
PELINO & LENTZ,
a Pennsylvania Professional Corporation

By: _____
Jay S. Ruder

JSR:sed
cc:   EMP Whole Loan I LLC

Exhibit 2

SCARPONE STAIANO LLC
By:  James A. Scarpone, Esq.
744 Broad Street, Suite 1901
Newark, New Jersey 07102
(973) 648-0065
Attorneys for Peter Mocco and Lorraine Mocco and The Mocco Parties

———————————————————— x
TITAN MANAGEMENT, L.P., et al.,           :
                                           :
              Plaintiffs,                  :
v.                                         :
                                           :
JAMES J. LICATA, et al.,                   :
                                           :
              Defendants.                  :
———————————————————— x

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION: ESSEX COUNTY

Docket No.  ESX-C-280-98

Civil Action (Action No. 1)

Before: Hon. Kenneth S. Levy, J.S.C.

———————————————————— 
PETER MOCCO, et al,                        :
                                           :
              Plaintiffs,                  :
                                           :
v.                                         :
                                           :
JAMES J. LICATA, et al.,                   :
                                           :
              Defendants.                  :
———————————————————— x

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION:    ESSEX COUNTY

Former Dkt. No.  ESX-L-4058-99
Chancery Dkt. No.  ESX-C-397-99

Civil Action (Action No. 2)

———————————————————— 
EMP WHOLE LOAN I,                          :
                                           :
              Plaintiff,                   :
                                           :
v.                                         :
                                           :
VILLAGE TOWNHOUSES ESTATES,                :
INC., et al.                               :
                                           :
              Defendants.                  :
———————————————————— x

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION: HUDSON
COUNTY

Former Dkt. No.  HUD-F-13779-99
Chancery Dkt. No.  ESX-C-396-99

Civil Action (Action No. 3)

This paper relates to all Actions.

Captions continue on next page

NOTICE OF MOTION

|   |   |   |
|---|---|---|
| ———————————— x | | |
| TITAN MANAGEMENT, L.P., | : | SUPERIOR COURT OF NEW JERSEY |
| | : | LAW DIVISION: MORRIS COUNTY |
| Plaintiff, | : | |
| | : | Docket No.   MRS-L-2442-99 |
| v. | : | Chancery Dkt. No.  ESX-C-399-99 |
| | : | |
| FIRST CONNECTICUT HOLDING GROUP, | : | Civil Action (Action No. 4) |
| LLC XXVI, et al. | : | |
| | : | |
| Defendants. | : | |
| ———————————— x | | |
| EMP WHOLE LOAN I, | : | SUPERIOR COURT OF NEW JERSEY |
| | : | CHANCERY DIVISION: SOMERSET |
| Plaintiff, | : | COUNTY |
| | : | |
| v. | : | |
| | : | Docket No.   F-17349-99 |
| LORRAINE MOCCO, et al., | : | Chancery Dkt. No.  ESX-C-6-00 |
| | : | |
| Defendants. | : | Civil Action (Action No. 5) |
| ———————————— x | | |

RETURN DATE: To be set by the Court
pursuant to R.:1:6-2(b)

TO:  Mr. James Licata
23 Meeting House Road
Greenwich, CT  06831

also: 68 Sinawoy Road
Cos Cob, CT  06802-2327

Cynthia Licata
23 Meeting House Road
Greenwich, CT  06831

also: 68 Sinawoy Road
Cos Cob, CT  06802-2327

SWI Holdings LLC
c/o Proskauer Rose LLP
1585 Broadway
New York, NY  10036
Attn: Dale Schreiber, Esq.

also: 219 East 69th Street
New York, NY  10021
Attn: Stephen Podell

Robert J. Percy, Esq.
41 Hebron Avenue
Glastonbury, CT  06033
(Criminal Counsel to James Licata)

2

Heidi J. Sorvino, Esq.                    Daniel Shepro, Esq.
Arent Fox                                 Sheproe & Blake
1675 Broadway                             2051 Main St.
New York, NY  10019-5820                  Stratford, CT 06615
(Bankruptcy Counsel to James Licata)      (Counsel to Cynthia Licata)

PLEASE TAKE NOTICE that, the undersigned attorneys for the Mocco Parties,

shall move before the Honorable Paul J. Vichness, J.S.C., at the Superior Court of New Jersey,

Chancery Division, Wilentz Justice Complex, 212 Washington Street, Newark, New Jersey, at

such time and date as the Court shall set for an Order as follows:

     1.    Directing that SWJ Holdings LLC be added to these consolidated cases as

an additional Defendant/Counterclaimant in Mocco, et al. v. Licata, et al., Action No. 2 of these

five consolidated cases, as successor-in-interest to the rights, claims and interests (if any) of

James Licata and Cynthia Licata or their affiliates.

     2.    Directing SWJ Holdings LLC and James and Cynthia Licata to execute

and record such corrective deeds and other instruments affecting title to the properties that are the

subject of this litigation, as the Court's Special Fiscal Agent shall find necessary and appropriate

to restore the records of title of all the subject properties to the condition that existed as of March

12, 2006, the date immediately preceding the first of the known recent recordings by SWJ, et al,

and further providing that failure by SWJ to comply with paragraph 1 of this Order within 10

days of notice from the Special Fiscal Agent of his approval of the form and necessity of filing

any corrective deed or other documents, shall automatically act as this Court's authorization and

appointment of the Special Fiscal Agent as "Attorney-in-Fact for SWJ Holdings, LLC and James

and Cynthia Licata Pursuant to Order of the Superior Court of New Jersey" for the purpose of

filing such corrective deed or other document.

3.     Imposing sanctions upon SWJ, James J. Licata and Cynthia Licata for their willful violations of this Court's September 21, 2001 Order (¶ 5) and for their willful attempts to circumvent and undermine this Court's Orders of April 29, 2002 and September 24, 2001.

4.     Granting final judgment against SWJ, James Licata and Cynthia Licata and all other parties in Action No. 2 declaring that Lorraine Mocco is the sole owner of 100% of the membership interests in the entity known as First Connecticut Holding Group LLC IV.

5.     Granting final judgment against SWJ, James Licata and Cynthia Licata and all other parties in Action No. 2 declaring that Peter Mocco is the sole owner of 100% of the membership interests in the entity known as Liberty Harbor Holdings LLC and that Lorraine Mocco is the sole owner of 100% of the membership interests in the entity known as The Atrium at Hamilton Park Urban Renewal Associates LLC.

6.     Converting This Court's "Order Dismissing the Licata Parties' Claims To, and Discharging Their Lis Pendens Filed Against, 'Fulton's Landing'," dated April 29, 2002, to a final judgment entered with prejudice to any future claims against that property, the entity which owns it, or the Mocco Parties whether such claims be asserted by the Licatas or anyone whose claim or interest arises from or through the Licatas.

7.     Directing the Special Fiscal Agent to return all documents entrusted to him pursuant to this Court's September 21, 2001 Order, to the Moccos and terminating all limitations or restrictions on the Moccos' authority and rights to deal with the entities known as First Connecticut Holding Group LLC II, III, IV, X, XI and XIII.

4

Pursuant to Rule 1:6-2(b) of the Rules Governing the Courts of the State of New Jersey, the Court shall determine the mode and scheduling of the disposition of this motion.

PLEASE TAKE FURTHER NOTICE that in support of its motion, the Mocco Parties shall rely upon the Certification of James A. Scarpone dated September 21, 2006 and the Certification of Peter Mocco dated September 21, 2006, and the Memorandum of Law in Support of the Moccos' Motion to Enforce Litigants' Rights etc., all of which are being served with this motion.

SCARPONE STAIANO LLC
Attorneys for The Mocco Parties

By: _____
James A. Scarpone

Dated: October 12, 2006

5

<u>CERTIFICATION OF SERVICE</u>

I, JAMES A. SCARPONE, of full age, certify as follows:

1.     I am an attorney-at-law of the State of New Jersey and a member of the law firm of Scarpone Staiano LLC.  In that capacity, I am familiar with the facts of this case.

2.     An original and one copy of the within Notice of Motion, Certification of James A. Scarpone dated September 21, 2006 and Certification of Peter Mocco dated September 21, 2006, in Support of the within Motion, were on this date forwarded via Hand Delivery to the Clerk of the Superior Court, Essex County Courthouse, Chancery Division, Wilentz Justice Complex, 212 Washington Street, Newark, New Jersey 07102, with a copy to the Hon. Paul I. Vichness, J.S.C.

3.     On the same day, I served the above papers on the following parties by Federal Express at the following address:

Mr. James Licata
25 Meeting House Road
Greenwich, CT  06831

also:   68 Sinawoy Road
        Cos Cob, CT  06802-2327

Cynthia Licata
25 Meeting House Road
Greenwich, CT  06831

also:   68 Sinawoy Road
        Cos Cob, CT  06802-2327

Daniel Shepro, Esq.
Shepro & Blake
2051 Main St.
Stratford, CT 06615
(Counsel to Cynthia Licata)

SWJ Holdings LLC
c/o Proskauer Rose LLP
1585 Broadway
New York, NY  10036
Attn: Dale Schreiber, Esq.

also:   219 East 69th Street
        New York, NY  10021
        Attn: Stephen Podell

Robert J. Percy, Esq.
41 Hebron Avenue
Glastonbury, CT  06033
(Criminal Counsel to James Licata)

Heidi J. Sorvino, Esq.
Arent Fox
1675 Broadway
New York, NY  10019-5820
(Bankruptcy Counsel to James Licata)

4.    I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

By: _James A. Scarpone_
James A. Scarpone

Dated:    October 12, 2006

7

Exhibit 3



SCARPONE STAIANO LLC
By: James A. Scarpone, Esq.
744 Broad Street, Suite 1901
Newark, New Jersey 07102
(973) 648-0065
Attorneys for Peter Mocco and Lorraine Mocco and The Mocco Parties

| | |
|---|---|
| ----------------------------------------x | |
| TITAN MANAGEMENT, L.P., et al., : | SUPERIOR COURT OF NEW JERSEY |
| : | CHANCERY DIVISION: ESSEX COUNTY |
| : | |
| Plaintiffs, : | Docket No.   ESX-C-280-98 |
| v. : | |
| : | Civil Action (Action No. 1) |
| JAMES J. LICATA, et al., : | |
| : | Before: Hon. Paul J. Vichness, J.S.C. |
| Defendants. : | |
| ----------------------------------------x | |

| | |
|---|---|
| PETER MOCCO, et al., : | SUPERIOR COURT OF NEW JERSEY |
| : | LAW DIVISION:   ESSEX COUNTY |
| Plaintiffs, : | |
| : | Former Dkt. No.   ESX-L-4058-99 |
| v. : | Chancery Dkt. No.   ESX-C-397-99 |
| : | |
| JAMES J. LICATA, et al., : | Civil Action (Action No. 2) |
| : | |
| Defendants. : | |
| ----------------------------------------x | |

| | |
|---|---|
| EMP WHOLE LOAN I, : | SUPERIOR COURT OF NEW JERSEY |
| : | CHANCERY DIVISION: HUDSON |
| : | COUNTY |
| Plaintiff, : | |
| : | Former Dkt. No.   HUD-F-13779-99 |
| v. : | Chancery Dkt. No.   ESX-C-396-99 |
| : | |
| VILLAGE TOWNHOUSES ESTATES, : | Civil Action (Action No. 3) |
| INC., et al. : | |
| : | |
| Defendants. : | This paper relates to all Actions. |
| ----------------------------------------x | |

Captions continue on next page

ORDER DATED NOVEMBER 27 , 2006

| | |
|---|---|
| ————————————————x | SUPERIOR COURT OF NEW JERSEY |
| TITAN MANAGEMENT, L.P., | LAW DIVISION: MORRIS COUNTY |
| : | |
| Plaintiff, : | Docket No.  MRS-L-2442-99 |
| v. : | Chancery Dkt. No.  ESX-C-399-99 |
| : | |
| FIRST CONNECTICUT HOLDING GROUP, : | Civil Action (Action No. 4) |
| LLC XXVI, et al. : | |
| : | |
| Defendants. : | |
| ————————————————x | |
| EMP WHOLE LOAN I, : | SUPERIOR COURT OF NEW JERSEY |
| : | CHANCERY DIVISION: SOMERSET |
| Plaintiff, : | COUNTY |
| v. : | |
| : | Docket No.  F-17349-99 |
| LORRAINE MOCCO, et al., : | Chancery Dkt. No.  ESX-C-6-00 |
| : | |
| Defendants. : | Civil Action (Action No. 5) |
| ————————————————x | |

This matter came before the Court upon the Motion of Peter and Lorraine Mocco and

their affiliated entities for an Order ~~enforcing this Court's September 21, 2001 Order~~ *ALLOWING THEM TO FILE AN AMENDED COMPLAINT* and for

certain related relief.  The Moccos were represented by Scarpone Staiano LLC (James A.

Scarpone, Esq. appearing) and Hellring Lindeman Goldstein & Siegal LLP (Matthew E.

Moloshok, Esq. appearing).  Opposing papers were filed on behalf of Cynthia Licata by Weiner

Lesniak LLP (Ronald A. Berutti, Esq. appearing).  Wilentz Goldman & Spitzer P.A. (Willard C.

Shih appearing) appeared on behalf of SWJ Holdings LLC but filed no papers.  Also appearing

on the record were: Joel R.  Glucksman, Esq. of Scarinci & Hollenbeck, LLC on behalf of the

Jersey City Redevelopment Association and Christopher P. Massaro, Esq. of Cole, Schotz,

2

Meisel, Forman & Leonard, P.A. on behalf of Read Properties Group, LLC.  For the reasons

stated on the record by this Court it is hereby ordered as follows:  *R W LIPOLCE, LORRAINE 17 8-09*

*IN ORDER TO PRESERVE THE STATUS QUO,*

1.    Pending further Order of this Court, James Licata, Cynthia Licata, SWJ

Holdings, LLC, their affiliated entities and their respective agents, servants, and attorneys are

hereby restrained from alienating, selling, transferring or encumbering any interests in LLCs or

properties which are the subject of any of these consolidated cases, including, but not limited to,

the following LLCs and properties:

    a.    First Connecticut Holding Group, LLC IV and any real estate
        owned by this entity;

    b.    Liberty Harbor Holding, LLC and any real estate owned by this
        entity;

    c.    Fulton's Landing Urban Renewal Company, LLC and any real
        estate owned by this entity;

    d.    The Atrium at Hamilton Park Urban Renewal Associates, LLC and
        any real estate owned by this entity;

    e.    41 and 81 Clark Road
        Bernardsville, New Jersey

    f.    Any real estate interests owned by First Connecticut
        Holding Group, LLC XIII.

*NOTHING CONTAINED IN THIS PARAGRAPH SHALL PREVENT ANY OF THE PARTIES FROM REQUESTING PERMISSION THE COURT TO ALIENATE SELL, TRANSFER OR ENCUMBER THE SUBJECT [A MOTION FOR PERMISSION TO FILE PROPERTIES SHOULD THE NEED ARISE*

2.    The Moccos shall promptly serve and file an amendment to the Complaint

in Action No. 2 (Chancery Docket No. ESX-397-99) adding such additional parties and claims as

are necessary and essential to a resolution of the ownership issues with respect to the properties

identified in paragraph 1 above. *SAID MOTION SHALL INCLUDE A COPY OF THE PROPOSED AMENDED COMPLAINT*

3.    In all other respects, the Mocco Motion is denied without prejudice, and

may be renewed after filing and service of the amended complaint described in paragraph 2

above. ALL CLAIMS AND DEFENSES OF ALL PARTIES ARE PRESERVED.

_Paul J. Vichness_

HON. PAUL J. VICHNESS, J.S.C.

4

Exhibit 4

*Formatted for Electronic Distribution*                                              *Not For Publication*

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF VERMONT

In re:

FIRST CONNECTICUT CONSULTING
GROUP, INC., *et al.,*
        Debtors-in-Possession.

Chapter 11 Case
Misc. Proceeding # 04-101

*Appearances:*

*James Scarpone, Esq.*
*Scarpone, Staiano & Savage, LLC*
*Newark, NJ*
    *and*
*Irve J. Goldman, Esq.*
*Pullman & Comley, LLC*
*Bridgeport, CT*
*For the Movants*

*Ronald L. Castle, Esq.*
*Lisa A. Estrada, Esq.*
*Arent Fox Kintner Plotkin &*
*Kahn PLLC*
*Washington, DC*
*For the Debtors-in-Possession*

*Alan J. Brody, Esq.*
*Scott J. Good, Esq.*
*Buchanan Ingersoll PC*
*Princeton, NJ*
    *and*
*James R. Byrnes, Esq.*
*Tyler, Cooper & Alcom, LLP*
*Hartford, CT*
*For the Official Committees*
*of Unsecured Creditors*

## MEMORANDUM OF DECISION
### GRANTING MOTION TO DISMISS

    Peter and Lorraine Mocco have filed a Motion to Dismiss the chapter 11 cases of First Connecticut Holding Group LLCs II, III, X, XI and XIII (collectively, "the LLCs"), asserting that they – not James Licata – owned these LLCs on the date of the bankruptcy filings, and therefore James Licata's filing of these cases is without legal effect.[1] Determining ownership is generally straightforward, but not so here. The relationship between the Moccos, James Licata, First Connecticut Consulting Group, Inc. ("First Connecticut")[2], and the LLCs, the various transactions that led to the creation and alleged transfers of ownership of the LLCs, and the

---

[1] While only Peter Mocco appeared in this Court, for convenience, Peter and Lorraine Mocco shall be referred to singularly as "Mocco," unless specifically noted otherwise.

[2] Licata is the principal of First Connecticut Consulting Group, Inc.

accusations of unsavory conduct on both sides, are tangled together in a complicated web. Once that web is finally disentangled, however, two essential strands of facts and law become evident as the undergirding for the whole web. The Motion to Dismiss is resolved by following these two strands to their logical, and legally compelled, conclusion. The first strand leads through facts relating to whether James Licata ("Licata") owned the subject LLCs and, hence, had authority to file these chapter 11 petitions. The second strand starts with the assumption that Licata did have authority to file these cases, and weaves in and out of the factors relevant to whether the cases were filed in good faith. After careful scrutiny of each fiber of the web, and navigation of the many loops and knots woven by the parties' conduct, this Court finds that Licata did not own the LLCs on the date of filing, and even if he did, that the petitions were not filed in good faith. Therefore, the Motion to Dismiss is granted.

This Court has jurisdiction to adjudicate this contested matter pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A). Although all of the chapter 11 cases and the Motion to Dismiss were filed in the United States Bankruptcy Court for the District of Connecticut, venue in this Court is proper by virtue of the Order for Change of Venue to the District of Vermont Pursuant to 28 U.S.C. § 1412, entered in January 2004.

I. DISCUSSION:
"OH, WHAT A TANGLED WEB WE WEAVE,
WHEN FIRST WE PRACTICE TO DECEIVE!"[3]

We all learned as children that it is indeed a tangled web we weave when first we practice to deceive. The illusion to a web is particularly apt in this case where each of the parties often acted in ways that can only be described as deceptive, with each party attempting to protect himself from suffering a loss and to keep the other party from knowing all the facts. The Court is asked to untangle the various strands of the web that Licata and Mocco have woven through a complex series of transactions. Some of the strands of this web are connected to the creation of legally sound LLCs as part of a legitimate financing vehicle. Some strands emanate from steps taken by Mocco because of his anxiety about whether Licata would keep his word. Some strands of the web spin out from Licata's desire to make substantial fees as both Mocco's financial consultant and his lender. And, finally, some strands flow from the skirmishes going on in each of the party's chapter 11 cases. It was clear from the testimony that these strands have become so entangled that even the parties have a hard time separating and making sense of them. Thus, before getting to the two key issues – ownership and good faith – the Court must make some findings about the nature of the legal relationship between the parties and the obligations imposed on Mocco and Licata under the three contracts between them.

---

[3] Sir Walter Scott, *Marmion, VI*, intro., st. 17, *in* BARTLETT'S FAMILIAR QUOTATIONS 396:23 (Justin Kaplan gen. ed., 17th ed. 2002).

The Court conducted an eight-day trial in February 2004 on Moccos' Motion to Dismiss, hearing testimony from eight witnesses and admitting over 85 exhibits. In addition to Licata and Mocco, the Court heard testimony from: (1) Pieter de Jong, Esq., an attorney who originally represented Licata, but who later was working for Mocco as well, and whom the Court finds generally credible; (2) Donald Wuertz, C.P.A., one of Mocco's employees whom the Court finds very credible; (3) Brian Opert, a former First Connecticut employee who brought property management expertise to Licata's organization and whom the Court finds very credible; (4) Lawrence Goldberg, C.P.A., who did tax work for First Connecticut from 1995 to 2000 and whom the Court finds generally credible; (5) Lawrence Lipson, Esq., an attorney with Proskauer Rose who represented Licata and First Connecticut and whom the Court finds credible – although he had little recall about the pertinent transactions between Licata and Mocco; and (6) Jeffrey Levitan, Esq., an attorney with the Proskauer Rose law firm who also represented First Connecticut regarding the transactions between First Connecticut and Mocco and whose recollection is tenuous as to the subject transactions, but whom the Court finds credible.[4] The Court finds that Peter Mocco was a more credible witness than Licata on all issues.

### A. The Legal Relationship Between Licata and Mocco and the Three Contracts Between Them

It was in May of 1996, when Mocco owned all the properties that were later placed in the LLCs, that Mocco met Licata and the events were put into motion that led to the instant controversy. At that time, Mocco had been in a chapter 11 reorganization case for approximately two years. He was desperately trying to have a plan of reorganization confirmed. However, one of Mocco's major secured creditors, First Union Bank ("First Union"), opposed his proposed Fourth Amended Plan of Reorganization (hereinafter, "the Plan") and in fact, had taken the rather unusual step of filing a competing plan. Mocco determined that the only way for him to get his Plan confirmed was to buy out First Union's claim.[5]

Mocco had previously reached an agreement with First Union as to a discounted buyout figure of the First Union claim, but the deal never closed because Mocco was not able to obtain financing to meet the immediate closing date upon which First Union insisted. Mocco's inability to secure immediate financing

---

[4] The Court finds that the testimony of Attorneys Lipson and Levitan, while credible, shed little light on the core issues, namely ownership of the LLCs (and, in turn, authority to file the present cases) and good faith. Likewise, the Court finds the widespread testimony about pre-September 26, 1996 meetings with the various attorneys obfuscates these issues. Thus, finding said testimony superfluous to the main issues that need to be determined here, the Court will not address it.

[5] The amount due First Union at this time was approximately $44 million.

brought the negotiations between Mocco and First Union to an abrupt conclusion.[5] Thus, Mocco found himself in a position where the only way he could extricate First Union from the bankruptcy reorganization process and obtain confirmation of his Plan was through a two-step financing arrangement, using a bridge loan to obtain the immediate relief he needed, with permanent financing to follow. In the spring of 1996, Mocco sought funding sources for a bridge loan. This is how and why he made the acquaintance of James Licata in May 1996.

### (1) The First Contract Between the Parties: The Consulting Agreement

Mocco met Licata through a third party. Licata represented himself as a workout specialist who had extensive experience providing financially distressed parties with what he termed "hard money." After their initial meeting, Mocco executed a consulting agreement with Licata and his company, First Connecticut, under which Mocco agreed to pay First Connecticut a $200,000 consulting fee. See Ex. —12. Importantly, under the terms of the consulting agreement, Licata was acting as Mocco's agent and First Connecticut was to find and secure a bridge loan for Mocco using the Hamilton Park Health Care Center property ("Hamilton Park") as collateral for the loan. It is critical to what later transpired that under the terms of the consulting agreement Mocco would retain ownership of the Hamilton Park property in this transaction. See id.

From his discussion with First Union, Licata learned, first, that First Union required $22 million in immediate cash to satisfy its $44 million claim and, second, that First Union did not want to deal with Mocco. Based upon these discussions, concluding that this deal could be consummated, and perceiving Mocco to be in desperate straits, First Connecticut agreed to lend Mocco short-term money to purchase First Union's claim. According to Licata, he told Mocco that First Connecticut had its own funds that it could lend Mocco, but not enough to cover the full $22 million. However, the evidence demonstrated that what First Connecticut actually had was a $16 million line of credit with EMP Whole Loan I ("EMP") which Licata planned to draw upon in order to make the loan.[7] Mocco would have to raise the difference, about $6 million, plus pay all closing expenses. Mocco soon discerned that he would have to pledge other properties he owned to generate the $6 million he needed to acquire the First Union claim. Mocco pledged his personal residence, the property known as A-1 Storage, a town house development, a condo complex and raw land in Sayerville, New Jersey,

---

[6] Mocco had defaulted on his First Union obligations and when he could not refinance those obligations in the short time frame demanded by First Union, First Union initiated foreclosure proceedings and had Mocco's bank accounts frozen. These actions were the impetus for Mocco filing for Chapter 11 bankruptcy protection.

[7] During his examination, Licata testified that he had a line of credit with EMP, see, e.g., Tr. 2/4/04 p.m. at p. 158 (Licata); however, there is no documentary evidence that the acquisition loan went to him personally. Moreover, there was testamentary evidence that the acquisition loan was made to First Connecticut. Thus, the Court finds that EMP made the acquisition loan to First Connecticut.

as well as other parcels in order to get this cash. What Mocco did not know was that, in its role as lender, First Connecticut would charge Mocco significant loan fees in addition to the consulting fees. However, it appeared that Mocco would be able to raise the necessary $6-plus million (that ultimately totaled $10.6 million, see Opert testimony, Tr. 2/19/04 at pp. 48-50), that the deal would go forward, and that First Union would finally be out of Mocco's bankruptcy case.

They hit the first bump in the road when EMP placed restrictions on First Connecticut's use of the $16 million, namely, that EMP would not advance this money to First Connecticut if that company was going to loan it to a debtor. EMP required that any loan of these funds be made to a bankruptcy-remote entity.[8] According to Licata, EMP instructed First Connecticut to: (1) set up limited liability companies ("LLCs") and transfer ownership of Mocco's properties into the LLCs to circumvent this restriction; and (2) to name Licata and his wife, Cynthia, as the owners of the LLCs, to ensure that the LLCs would be true "bankruptcy-remote entities."

### (ii) The Second Contract Between the Parties: The 3-page Agreement

Mocco did not want to transfer ownership of his properties into the LLCs, but he was desperate to have First Union's claim bought out so that he could have his Plan confirmed and he could get on with his life. Knowing the precarious situation Mocco was in, the "EMP boys" (as Licata calls them) made their squeeze-play; they informed Licata that Mocco had to put up an additional $5 million for EMP to use for its various investment projects as a condition of EMP making the loan to First Connecticut. Having run out of options, Mocco resignedly agreed to "invest" the $5 million in EMP. However, Mocco was nervous about the many new requirements and changes in the terms of the financing and adamantly wanted to make clear that ownership of the properties being placed in the LLCs would revert to Mocco once the bridge loan was refinanced and replaced with long-term debt. To address these concerns, Mocco drafted an agreement between himself and Licata, specifying that Licata was taking title to the properties as a nominee only. Although he is an attorney, Mocco did not create a legally sophisticated or complex document. The agreement was in plain English and only three pages long.[9] The first two pages describe Licata's responsibilities and the third page describes Mocco's responsibilities. Significantly, Licata signed the 3-page agreement at the bottom of the second page. Conversely, although he drafted it and insisted that Licata sign it, Mocco never signed the 3-page agreement. While it is not dated, both Licata and Mocco testified that Mocco presented it and

---

[8] During the course of the trial, it was revealed that this requirement actually originated from EMP's lender, CS First Boston, which had a policy prohibiting loans to a party who was either in bankruptcy or had previously filed bankruptcy.

[9] Hence, this agreement is referred to by the parties and herein as "the 3-page agreement".

Licata signed it on or about September 25, 1996. The timing is important as this was the same day the properties were transferred into the LLCs, and just one day before the acquisition financing closed and the final hearing was held confirming Mocco's Plan. Of particular significance, the agreement made clear that: (1) First Connecticut was acting as Hamilton Park's nominee and consultant;[10] (2) the properties transferred to First Connecticut would be reconveyed to Mocco for $1 when the acquisition financing was replaced with permanent financing; and (3) if and when the property would be transferred back to Mocco was within Mocco's sole discretion. Several witnesses confirmed that the 3-page agreement was intended specifically to accomplish these three objectives. See, e.g., Tr. 2/10/04 at pp. 121-22 (Mocco); Tr. 2/2/04 a.m. at p. 29 (de Jong); Tr. 2/19/04 at pp. 32-33 (Opert). In stark contrast, however, Licata testified that he believed the 3-page agreement was "a non-binding gentlemen's agreement." Cf., Tr. 2/4/04 p.m. at pp. 163-64 (Licata); Tr. 2/9/04 p.m. at pp. 187-89 (Licata). The Court finds Licata's testimony on this point to be both disturbing and disingenuous.

The dispute over the import of the 3-page agreement revolves, to a large extent, on the meaning of the term "nominee" and whether Licata was holding title to Mocco's properties in a purely nominee capacity. According to Black' Law Dictionary, a nominee is "[o]ne designated to act for another in his or her place." BLACK'S LAW DICTIONARY 1050 (6th ed. 1990). As one court has described it, a nominee is like a dummy, holding mere title to the property without any beneficial interest; it is an arrangement of convenience. See National Bond & Share Corp. v. Hoey, 14 F. Supp. 787, 788 (S.D.N.Y. 1936). A court should consider six factors when determining whether property is held by a nominee:

> (1) whether inadequate or no consideration was paid by the nominee; (2) whether the property was placed in the nominee's name in anticipation of a lawsuit or other liability while the transferor remains in control of the property; (3) whether there is a close relationship between the nominee and the transferor; (4) whether they failed to record the conveyance; (5) whether the transferor retained possession; and (6) whether the transferor continued to enjoy the benefits of the transferred property.

LiButti v. United States, 968 F. Supp. 71, 76 (N.D.N.Y. 1997),[11] aff'd in part and rev'd in part on other grounds, 178 F.3d 114 (2d Cir. 1999). For purposes of the instant dispute, it is particularly relevant that this

---

[10] As between the parties, Mocco consistently acted on behalf of Hamilton Park, signing all relevant documentation for Hamilton Park.

[11] Having found in a proceeding below that New Jersey's substantive law applied, the district court instructed in this case that it found no reported New Jersey cases addressing the factors relevant to the nominee theory. See LiButti, 968 F. Supp. at 75. Therefore, it would apply factors used by other courts that have considered the nominee theory. See id.; Towe Antique Ford Found. v. IRS, 791 F. Supp. 1450, 1454 (D. Mont. 1992), aff'd, 999 F.2d 1387 (9th Cir. 1993); Hill v. United States, 844 F. Supp. 263, 271 (W.D.N.C. 1993)).

list of factors does not include a requirement that appointment of a nominee must be evidenced by a writing.[12] Thus, even if the Court were to find that the validity of the 3-page agreement was in question because Mocco did not sign it, the analysis of whether Licata was holding the property as a nominee would not depend on resolution of that question.

Applying this six-prong test to the present facts, the Court finds that Licata did hold title to these properties as a nominee. First, Licata did not pay for the properties transferred into the LLCs and the testimony demonstrated that he never contributed his own funds for the maintenance or debt service of these properties. See, e.g., Tr. 2/19/04 at pp. 42-43 (Opert). Second, the properties were placed in the LLCs and the ownership of those LLCs was placed in Licata' name in anticipation of receiving approval of Mocco's Chapter 11 Plan, i.e., to avoid continued litigation over the confirmation of Mocco's Plan. Third, while not having a close relationship in a familial sense, Licata and Mocco had a tight business relationship, as evidenced by the facts that Mocco had hired Licata as his consultant, had agreed to enter joint ventures with him and had advanced funds for those joint ventures. See, e.g., Tr. 2/19/04 at pp. 62-63 (Opert). Fourth, while the conveyance of the properties to the LLCs were recorded, the properties were never titled in Licata's name and the 3-page agreement plainly stated that the purpose of placing the properties in the LLCs was administrative ease. Fifth, the evidence unequivocally demonstrated that Mocco retained "possession" of the properties. No keys to the properties were ever given to Licata or any of his employees, Mocco continued running and managing all the properties, and Mocco paid all expenses associated with the properties. See, e.g., Tr. 2/19/04 at pp. 42-43 (Opert). Sixth, to the extent applicable, Mocco did continue to "enjoy" the benefits of the properties. Mocco continued to live in his personal residence; he also continued to operate the commercial and investment properties and used a substantial portion of one of the properties for his business headquarters. Thus, the Court finds the facts presented satisfy all six factors set forth in LiButti, and concludes that Licata was Mocco's nominee and held title to the properties in a nominee capacity only. This conclusion is consistent with the 3-page agreement, but is not dependent upon that agreement being enforceable.

Though not essential to its conclusion, the Court does find the 3-page agreement to be valid and enforceable. Licata's argument that the 3-page agreement is not enforceable because Mocco did not sign it is unconvincing. Mocco's conduct emphatically demonstrates his commitment to the terms of the agreement and constitutes promissory estoppel as to Licata's argument that the agreement is not binding. As required

---

[12] Licata argues that under the terms of the consulting agreement between himself and Mocco, he was Mocco's "sole and exclusive agent" for 120 days and since that 120-day exclusivity period expired before the September 26, 1996 confirmation hearing he cannot be found to be Mocco's nominee. However, since the Court finds no writing is required to appoint a nominee, it finds this argument unpersuasive.

by the agreement, Mocco: (1) repaid the acquisition loans obtained by First Connecticut from EMP, see, e.g., Tr. 2/10/04 at p. 124 (Mocco); (2) contributed over $10 million to First Connecticut towards the $22 million needed to buy out First Union's claim, see, e.g., Tr. 2/19/04 at pp. 62-63 (Opert); (3) placed long-term triple-net leases on the Hamilton Park and A-1 properties to secure the maximum refinancing possible on those two properties and used the refinancing proceeds to pay off the acquisition debt, see, e.g., Tr. 2/19/04 at pp. 113-14 (Goldberg); (4) made an additional $5 million available to First Connecticut for joint ventures undertaken by himself and First Connecticut, see, e.g., Tr. 2/9/04 p.m. at 56 (Mocco); and (5) agreed to make First Connecticut whole if it incurred additional tax obligations over and above its own tax obligations as a result of the contemplated property transfers, see, e.g., Tr. 2/10/04 p.m. at p. 46 (Mocco). See Ex. —6 at ¶2 (a-f). "Quasi-contractual liability such as promissory estoppel is based on the equitable principle that a person should not be allowed to unjustly enrich himself at the expense of another." Sontro v. Cendant Corp., 223 F. Supp.2d 563, 574 (D.N.J. 2002) (citing Rodichok v. Limitorque Corp., 1997 WL 392535 (D.N.J.1997)); see also Cweklinsky v. Mobil Chemical Co., 364 F.3d 68 (2d Cir. 2004) (relying on state law to determine whether a cause of action lies under the theory of promissory estoppel). Thus, while Mocco does not seek recovery under promissory estoppel in this Court, the principle warrants the Court's finding that the 3-page agreement is binding on both Mocco and Licata the principle warrants the Court's finding that the 3-page agreement is binding on both Mocco and Licata[13].

<u>(iii)  The Third Contract Between the Parties: The Escrow Agreement</u>

On September 25, 1996, Mocco's properties were transferred to the LLCs so the collateral could be held in the form required by EMP.  Once the properties were in the bankruptcy-remote LLCs and the certificates of ownership for each LLC (that were issued to Licata and his wife) were pledged to EMP (together with unit powers), EMP loaned First Connecticut the money necessary for First Connecticut to buy out First Union's claim in Mocco's bankruptcy case. This was the backdrop which necessitated the creation of the third and final contract between Mocco and Licata.

In May 1997, Mocco and Licata entered into an Escrow Agreement, naming Pieter de Jong, Esq. as their Escrow Agent.  See Ex. —8.  The stated purpose of the Escrow Agreement was to "provide for the orderly transition of title" to the properties held by the LLCs back to Mocco.  See id. at 1. Under the Escrow Agreement, once EMP released its lien on the ownership interest in the LLC holding each parcel of real

---

[13] "Under New Jersey law, to recover on a theory of promissory estoppel, a plaintiff must allege and prove that: (1) there was a clear and definite promise; (2) the promise was made with the expectation that the promisee would rely upon it; (3) the promisee reasonably did rely on the promise; and (4) [the promisee] incurred a detriment in said reliance." Sontro v. Cendant Corp., 223 F. Supp.2d at 574 (citing Swider v. Ha-Lo Indus., 134 F. Supp.2d 607, 619 (D.N.J.2001); Peck v. Imedia Inc., 293 N.J. Super. 151, 165, 679 A.2d 745, 752 (App. Div.1996)).

property, EMP was to convey ownership of that parcel to the Escrow Agent; upon EMP's conveyance of the ownership shares to the Escrow Agent, the Escrow Agent was authorized to issue replacement shares to Mocco or his designee. See id. at ¶4. In conjunction with the execution of the Escrow Agreement, Licata (and his wife) granted de Jong a limited power of attorney "for the sole, exclusive and restricted purpose to enable the grantee [EMP] to endorse and surrender to the [LLC] for which it pertains, member/shareholder share certificates" issued to him. See id. at p.9. Licata also signed an Authorization Statement, dated June 2, 1997, instructing EMP to deliver the membership certificates to de Jong. See id. at p.11. At Mocco's request, Licata re-executed the 3-page agreement at the time the parties executed the Escrow Agreement. It is not clear why the parties executed the Escrow Agreement and re-executed the 3-page agreement at this time, but neither Licata nor Mocco deny that they did so, and the Court concludes that their reason for doing so is irrelevant.

Having examined the Escrow Agreement together with the record before it, the Court finds, contrary to Licata's claim, the conditions of the Escrow Agreement were met such that de Jong, in his capacity as the Escrow Agent, was required to issue documents of ownership to Mocco or his designee. EMP had released the "ownership shares" of the respective LLCs, the Licatas had executed and delivered irrevocable Limited Powers of Attorney to de Jong granting de Jong the authority to issue replacement shares to the person or entity Mocco would designate, and Mocco designated the person or entity to whom he wanted replacement shares issued. Thus, all conditions precedent had been satisfied and de Jong was bound by the Escrow Agreement to issue the replacement ownership shares.

### B. Ownership of the LLCs
#### (1) Documentary Evidence of Mocco's Ownership

Having described the relationship between the parties, the Court turns to the penultimate question of who owned these LLCs on the date these bankruptcy cases were filed. Establishing ownership of an LLC is more complicated than determining ownership of other entities because an LLC is a hybrid creature manifesting some attributes of a corporation and some attributes of a partnership. A limited liability company is a vehicle designed to give an individual or entity the protection from liability associated with a corporation, as well as the tax benefits of a partnership. See Kuhn v. Tumminelli, 366 N.J. Super. 431, 439, 2004 WL 239883, at *3 (N.J. Super. A.D. 2004) (citing to New Jersey State legislative history). As one commentator has observed, "The allure of the limited liability company is its unique ability to bring together in a single business organization the best features of all other business forms—properly structured, its owners obtain both a corporate-styled liability shield and the pass-through tax benefits of a partnership." See David M. Hastings, J.D., Annotation, *Construction and Application of Limited Liability Company Acts*, 79 A.L.R.5th 689, at § 2[a].

The LLCs that were created on September 12, 1996 were intended to be bankruptcy-remote entities that would hold title to Mocco's properties; they were established in New Jersey and, according to their respective operating agreements, were governed by the laws of the State of New Jersey. See, e.g., Ex. D-48. These operating agreements contained a requirement that the agreement of all members was required in order to effect the transfer of any member's interest. However, the operating agreements did not set forth the mechanics of transfer. Similarly, the agreements failed to spell out how ownership would be evidenced. Attorney de Jong ordered a limited liability kit for each LLC when he set up the LLCs; for each LLC there was a seal, a certificate book with 15 perforated share certificates (pre-numbered in sequential order), and a certificate ledger. Certificates were issued for each LLC and the initial issuance and transfer of certificates were recorded in the appropriate ledger. Additionally, to facilitate the acquisition financing necessary to buy out First Union's claim in Mocco's bankruptcy case, de Jong issued unit powers for each LLC that were given to EMP as security for its loan to First Connecticut.

Pursuant to the May 1997 Escrow Agreement, see Ex. —8 at ¶4, in June 1997, Licata granted a Limited Power of Attorney to Pieter J. de Jong, Esq. "for the sole, exclusive and restricted purpose to enable the grantee [de Jong] to endorse and surrender to the Entity for which it pertains, member/shareholder share certificates issued in my name" for each of the LLCs. See id. He also executed an "Authorization Statement" pursuant to the Escrow Agreement, see. id. at ¶3, which was sent to EMP and which authorized EMP to deliver "all ownership shares of the entities owning the Properties upon the release of the same by EMP . . ." This issuance and transfer of certificates were documented in the ledgers. However, although all of the certificates were prepared, not all of them were signed. There is no evidence other than the ledgers and share certificates regarding the ownership of the LLCs; that is, none of the LLCs have minutes of member meetings or resolutions adopted by the members or amendments of the operating agreements in their respective records.

According to the New Jersey Limited Liability Act, where an operating agreement does not address an issue, the Act serves as the default authority on that issue. See Kuhn, 366 N.J. Super. at 431, 2004 WL 239883, at *4. Unfortunately, the New Jersey LLC Act provides little instruction on the issue of how to effect transfer of LLC ownership interests either. When, as here, neither the subject LLC documents nor the LLC Act address the salient issue, it is appropriate for this Court to look to, and analogize from, case law addressing the issue in the context of corporate or partnership entities.

> [W]hen a court is interpreting an LLC act or agreement, the court will focus on the particular aspect of the LLC that gives rise to the problem, with emphasis on the foundational business form from which that characteristic originated. Usually, the particular aspect can be traced to either the corporate components or the partnership components of the LLC act or agreement. In such cases where the characteristics originated from the partnership aspects of the LLC, the court will use the established principals [*sic*] and precedent of the

> partnership law to resolve the issue. In such cases where the characteristic originated from the corporate aspects of the LLC, the court will utilize the established principals [sic] and precedent of corporate law to resolve the issue.

David M. Hastings, J.D., Annotation, *Construction and Application of Limited Liability Company Acts*, 79 A.L.R.5th 689, at § 2[a].

Based on the evidence before it, the Court finds that the certificate ledgers for each LLC were the controlling documents demonstrating the transfer of interest in the LLCs and demonstrating the ultimate ownership of interests in the LLCs. The Court finds that LLCs mirror corporations as to evidence of ownership. Thus, it relies on cases interpreting ownership in corporations to analyze this question. More specifically, the Court finds that in this instance the LLCs before it are most similar to closely-held corporations. Therefore, the Court gives jurisprudence of closely-held corporations the most weight on this issue.

Under New Jersey case law regarding closely-held corporations, the courts have held that it is not necessary for a stock certificate to be issued to a stockholder to establish ownership rights, "the certificate being merely the evidence or muniment of title, and not the property itself." Piechowski v. Matarese, 54 N.J. Super. 333, 343 (1959) (citations omitted); see also Crouse v. Agorganic, Inc., No. A-5877-01T5, slip op. at 10 (N.J. Super. Sept. 30, 2003) (ownership in a close corporation need not be evidenced by a stock certificate); Abraham v. Township of Teaneck Ethics Bd., 349 N.J. Super. 374, 380 (2002) (instructing that physical possession of stock certificates is not a prerequisite to ownership in a company). "In the absence of an express provision to the contrary, stock may be transferred by delivery of a separate written transfer, without the delivery of any certificate, especially where no certificate has ever been issued, or where it is not in possession of the transferor." Hill v. Warner, Berman & Spitz, P.A., 197 N.J. Super. 152, 163 (1984) (citations omitted). Hence, in reliance upon New Jersey case law involving closely-held corporations, the Court finds that Licata's failure to transfer a certificate to Mocco does not vitiate Mocco's ownership. The Court further finds that per the certificate ledger, Mocco was the record owner of the LLCs and thus owned the properties held by those LLCs, as of September 1, 2001.

(ii)  Conduct by Mocco Demonstrating His Ownership

Four crucial events between the parties transpired on or around September 26, 1996. First, the LLCs were created and the Mocco properties were transferred to the LLCs to provide the collateral for the First Connecticut acquisition loan. Second, EMP loaned First Connecticut $16 million toward the purchase of the First Union claim. Third, First Connecticut used the loan proceeds from EMP and $6 million from Mocco to purchase the First Union claim. Fourth, and just hours after First Connecticut bought First Union's claim

against Mocco, the Mocco chapter 11 Plan was confirmed – thanks to First Connecticut's vote (in place of First Union's) in favor of Mocco's Plan.

At all times subsequent to these four transactions, Mocco provided the monies necessary to service the EMP acquisition loan. See, e.g., Tr. 2/10/04 p.m. at pp. 84-91 (Mocco); Tr. 2/19/04 at pp. 42-43 (Opert). Because of the rather awkward nature of the loan transaction and the fact that the owner of the collateral was not the obligor on the loans, an elaborate payment relay procedure was created. On a monthly basis, First Connecticut contacted Mocco to provide him with that month's EMP invoice amount, Mocco wired the funds to First Connecticut, and First Connecticut would then forward the payment to EMP. Mocco never missed a payment. See, e.g., Tr. 2/10/04 p.m. at pp. 84-91 (Mocco). Moreover, while First Connecticut facilitated the monthly payments from Mocco to EMP, the record is unequivocal that no funds for the EMP debt service ever came from the resources of either Licata or First Connecticut. See, e.g., Tr. 2/19/04 at pp. 42-43 (Opert).

It was always Mocco's intention to replace the acquisition financing with long term financing. To that end, from the date his Plan was confirmed forward, Mocco zealously sought to secure long-term financing of the properties that were titled in the LLCs. For example, Mocco secured permanent financing from Nomura Bank on the Hamilton Park property in November 1996, obtained long-term financing from GE Capital on the A-1 Storage property shortly thereafter, and used the net proceeds from both loans to pay down the EMP acquisition debt. The record reflects that by the spring of 1998, Mocco had replaced all the EMP acquisition debt with long-term financing. See, e.g., Tr. 2/10/04 p.m. at pp. 124 (Mocco).

### (iii) Sworn Schedules Evidencing Licata's Lack of Ownership

Although not determinative on their own, this Court finds the statements Licata made under penalty of perjury in his own chapter 11 case to be useful in the Court's disentangling of the web created by the unusual transactions between Mocco and Licata, and to shed further light on the question of whether Licata owned the LLCs. Licata asserts that he owned the LLCs and had authority to file bankruptcy petitions for the LLCs in September 2002. However, the schedules attached to the Statement of Financial Affairs in his personal bankruptcy case clearly indicate that from 1997 forward he had no ownership interest in any of those LLCs. See Ex. —63, Notice of Filings Schedules and Statement of Financial Affairs Affidavit, with excerpts and Attachment to Schedule A to Chapter 11 Bankruptcy Petition, Licata Personal Bankruptcy (July 2002).

During his testimony in this proceeding, Licata acknowledged both the authenticity of his signature on the bankruptcy petition, statements and schedules, as well as the fact of his representation in the schedules that he did not own the LLCs on the date of his chapter 11 filing. He interchangeably protested that the schedules were in error, that he did not read them before he signed them, and that he thought he had amended them. However, the record is clear that Licata did not amend his bankruptcy schedules to change this

representation about the LLCs. Moreover, the Court does not believe Licata's testimony that he did not read the schedules before he signed them nor Licata's claim that he signed whatever documents were put in front of him without examination. Cf., e.g., Tr. 2/19/04 at pp. 57-58 (Opert) (testifying that it was Licata's practice to review and mark up every document that crossed his desk). As required by the bankruptcy rules, Licata signed his personal bankruptcy petition under penalty of perjury. "The Bankruptcy Code expects that when debtors and their attorneys are finalizing and signing their schedules, they will devote their full attention to them in order to ensure that they are complete and accurate to the best of the debtor's knowledge and information." In re Ptasinski, 290 B.R. 16, 26-27 (Bankr. W.D.N.Y. 2003); see also Suggitt v. French (In re French), 2003 WL 21288644 (Bankr. D. Vt. May 30, 2003). "To allow debtors to ignore the seriousness of their oath, submit documents to the court which contain numerous material inaccuracies, and, when the inaccuracies are discovered, excuse their behavior because they claim they failed to read the documents before signing them under oath, would undermine the whole structure of the system." Jordan v. Bren (In re Bren), 303 B.R. 610, 616 (B.A.P. 8th Cir. 2004). Thus, it is this Court's finding that Licata is bound by the statements he made under penalty of perjury that he did not have any ownership interest in the LLCs in July 2002 when he personally filed for bankruptcy protection.

## C. The Question of Good Faith

The seminal case on the question of a whether a debtor's case was filed in good faith is Matter of Little Creek Development Co., 779 F.2d 1068 (5th Cir. 1986), in which the Fifth Circuit Court of Appeals propounded the following comprehensive analysis:

> Determining whether the debtor's filing for relief is in good faith depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities. Findings of lack of good faith in proceedings based on §§ 362(d) or 1112(b) have been predicated on certain recurring but non-exclusive patterns, and they are based on a conglomerate of factors rather than on any single datum. Several, but not all, of the following conditions usually exist. The debtor has one asset, such as a tract of undeveloped or developed real property. The secured creditors' liens encumber this tract. There are generally no employees except the principals, little or no cash flow, and no available sources of income to sustain a plan of reorganization or to make adequate protection payments pursuant to 11 U.S.C. §§ 361, 362(d)(1), 363(e), or 364(d)(1). Typically, there are only a few, if any, unsecured creditors whose claims are relatively small. The property has usually been posted for foreclosure because of arrearages on the debt and the debtor has been unsuccessful in defending actions against the foreclosure in state court. Alternatively, the debtor and one creditor may have proceeded to a stand-still in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford. Bankruptcy offers the only possibility of forestalling loss of property. There are sometimes

allegations of wrongdoing by the debtor or its principals. The "new debtor syndrome," in which a one-asset entity has been created or revitalized on the eve of foreclosure to isolate the insolvent property and its creditors, exemplifies, although it does not uniquely categorize, bad faith.

Id. at 1072-73. The Second Circuit relies on a very similar list of facts when considering whether a debtor's filing was in bad faith:

(1)    the debtor has only one asset;
(2)    the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors;
(3)    the debtor's one asset is the subject of a foreclosure action as a result of arrearages of default on the debt;
(4)    the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action;
(5)    the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;
(6)    the debtor has little or no cash flow;
(7)    the debtor can't meet current expenses including the payment of personal property and real estate taxes; and
(8)    the debtor has no employees.

See In re C-TC 9th Avenue P'ship, 113 F.3d 1304, 1311 (2d Cir. 1997) (quoting Pleasant Pointe Apartments, Ltd. v. Kentucky Hous. Corp., 139 B.R. 828, 832 (W.D. Ky. 1992), and citing Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Virginia (In re Phoenix Piccadilly, Ltd.), 849 F.2d 1393, 1394-95 (11th Cir. 1988)); Little Creek, 779 F.2d at 1072-73); see also In re Laguna Assoc., Ltd. P'ship, 30 F.3d 734, 737 (6th Cir. 1994) (listing similar factors to consider when determining whether a chapter 11 case is filed in bad faith).

Here, each LLC was established as a bankruptcy-remote entity that held title to one distinct piece of real property. None of the LLCs ever had employees. Credible testimony by Mocco established that none of the LLCs ever had a bank account. See Tr. 2/10/04 at pp. 89-90 (Mocco). As of the bankruptcy filing date for each LLC, Licata had no ownership interest in the LLCs; yet, he was representing that the properties held by the LLCs were his. Credible testimony by Mocco established that the LLCs had few unsecured creditors and that the bills of each LLC were consistently being paid in a timely fashion. See Tr. 2/10/04 at pp. 84-91. There were no foreclosure actions pending or any allegations that the secured debt on any of these parcels was not current. Mocco and Licata were involved in state court litigation regarding the ownership of the property; there were suits pending regarding the amount owed to EMP; and the litigation was proceeding slowly. Of particular importance is the fact that none of this litigation supports the assertion that the LLCs had financial difficulties or, for any reason, required a bankruptcy reorganization. That is not to say, however, that the state

court litigation is wholly unrelated to the filing of these LLC bankruptcy cases. On the contrary, the record discloses that the LLC bankruptcy petitions were filed on the eve of a hearing when the parties expected the state court to resolve the question of who owned the LLCs. Thus, one important result of the LLCs being filed in bankruptcy was that the state court action – and its critical ruling determining ownership of the LLCs – was stayed.

As the Second Circuit stated: "The purpose of Chapter 11 reorganization is to assist financially distressed business enterprises by providing them with breathing space in which to return to a viable state." In re C-TC 9th Avenue P'ship, 113 F.3d at 1310 (quoting In re Winshall Settlor's Trust, 758 F.2d 1136, 1137 (6th Cir. 1985)). Even assuming *arguendo* that Licata had the authority to file the subject bankruptcy petitions for the LLCs (which the Court finds Licata did not), based on the credible evidence, the Court finds no legitimate reorganization purpose to be served by the filing; each LLC was a viable entity that had been promptly servicing its debt obligations and paying all of its other bills in a timely manner. See, e.g., Tr. 2/10/04 (pm) at pp. 84-91 (Mocco); Tr. 2/19/04 at pp. 42-43 (Opert). The Court finds that the only purpose accomplished by the filing of the LLC petitions was a spurious one: it allowed Licata to stay state court litigation which might have definitively defeated his claimed ownership interest in these properties.[14]

Thus, based on the ample record before it, the Court finds, as an alternative ground for dismissal, that Licata's filing of the LLCs under chapter 11 of the Bankruptcy Code was in bad faith.

### D. Equitable Considerations and State Court Proceedings

Licata argues that even if this Court finds that he did not own the LLCs at the time of filing and even if it appears that he may not have filed the cases in good faith, Mocco's Motion to Dismiss should be denied because of Mocco's bad faith. Alternatively, Licata asserts that to the extent Mocco did own the properties at some relevant point in time, Mocco's ownership was revoked by the state court in September 2001, about ten months before Licata filed his own and the LLCs' bankruptcy cases. The Court finds no merit in either argument.

### (1) Mocco's Alleged Bad Faith

Licata vigorously argues that great weight should be given to the fact that at the final confirmation hearing neither Mocco nor his attorneys disclosed to the bankruptcy court Licata's identity as the nominee

---

[14] The Bankruptcy Court is not endowed with exclusive jurisdiction over litigation involving these LLCs. If the LLC bankruptcy cases are dismissed upon a finding that Licata did not own the LLCs, the suit in the New Jersey state court will no longer be stayed and that court can resolve the issues remaining between these parties and involving the debts secured by these properties.

owner of the LLCs, the relationship between Licata and the lender, nor the existence of the 3-page agreement. Licata insists that Mocco's failure to disclose this information, particularly the failure to disclose the 3-page agreement, constitutes such outrageous bad faith that it should bar Mocco from the relief he seeks herein, regardless of whether he owned the LLCs on the date Licata filed each LLC into bankruptcy. First, the Court finds this is not the proper forum and Licata is not the proper party to raise Mocco's alleged bad faith for not disclosing the 3-page agreement in his personal bankruptcy case. Licata suffered no injury from the non-disclosure; he benefitted from it. See generally, Hirsh v. Arthur Anderson & Co., 72 F.3d 1085 (2d Cir. 1995) ("where creditors have . . . a claim for injury that is particularlized as to them, they are exclusively entitle to pursue that claim, . . ."). Second, the Court is persuaded by Mocco's *in pari delicto* rebuttal to this argument: Licata is equally culpable for the non-disclosure of the 3-page agreement as Mocco is. As a party to the 3-page agreement, Licata could have informed the bankruptcy court of its existence, but he did not. See generally, Pinter v. Dahl, 486 U.S. 622, 632, 108 S. Ct. 2063, 2070 (1988) ("The equitable defense of *in pari delicto*, which literally means 'in equal fault,' is rooted in the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct."). Third, even if this Court found Licata had standing to raise the issue of Mocco's bad faith at this time, having reviewed the transcript of the confirmation hearing, see Ex. D-10, the Court would find, on the merits, that Licata's argument takes the statements of Mocco's counsel out of context and that there was no fraud perpetrated on the bankruptcy court by Mocco's failure to disclose the 3-page agreement.

Licata also vehemently argues that Mocco's failure to sign the 3-page agreement is another indicia of Mocco's bad faith. However, as noted above, this Court finds that there was no legal benefit lost by virtue of Mocco's failure to sign that agreement: he acted as if he was bound by it and he fulfilled his obligations under it. Licata has failed to demonstrate how Mocco's failure to sign the agreement establishes fraudulent intent or bad faith by Mocco.

(ii) The State Court Order Directing Turnover of Ownership Documents to a Receiver

Licata's assertion that the New Jersey state court order directing Mocco to surrender the LLCs' certificates to a state court receiver effected a revocation of Mocco's ownership is also without merit. The tone and content of the state court order patently communicates that the state court's rationale for demanding the title documents be turned over to a receiver was to maintain the *status quo* and prohibit the property from being encumbered or transferred. The order provided, *inter alia*:

4.    Peter Mocco and Lorraine Mocco shall, within seven (7) days (i.e., on or before September 14, 2002) physically deliver to Dennis Drasco, Esquire, the originals of all materials delivered to them by Pieter de Jong on or about September 1, 2001. Those materials consist, in

general, of unit powers, units of interests in LLCs and replacement units for the "Holding Entity" LLCs referenced in the Mocco Complaint in Action No. 2. Mr. Drasco shall hold these materials until further Order of the Court, and shall provide copies of such material to counsel for the Licata parties.

5.    Pending further order of this Court, or should the Bankruptcy Court assume jurisdiction of this matter, the order of the Bankruptcy Court, no party or any affiliate of a party shall transfer, lien, or encumber any interest in any of the Holding Entity LLCs or any properties owned in the name of any such Holding LLCs.   The Order set forth in this paragraph does not apply to the property known as the Atrium.

Peter Mocco et al., v. James Licata et al., No. ESX-C-397-99, Order (N.J. Super. Ct. Ch. Div. (Essex) Sept. 21, 2001) (Levy, J.), Ex.3.

Licata's insistence that this order has an impact on ownership is unfounded.  The critical issue raised by this order is who owned the property at the time of its entry, that is to say, what was the *status quo* that the order sought to preserve. This Court finds that Mocco was the owner of the property at the time the state court entered its order.  While it is true that the New Jersey state court very deliberately restricted Mocco's – as well as Licata's – ability to manipulate legal title to the property, its order preserved the title to the property as it existed as of that date.  As is clear from its order, if the matter were brought within the jurisdiction of the bankruptcy court, the New Jersey Superior Court would make no determination regarding the ownership of properties until after the bankruptcy-related issues were resolved by the bankruptcy court.  Thus, but for the bankruptcy issues raised, the state court would have proceeded in the fall of 2001 to determine who owned the properties.  In July 2002, while the state court, Mocco, and Licata were waiting for the bankruptcy court's ruling, Licata personally filed for bankruptcy protection and, in September 2002, he caused the LLCs to file for bankruptcy protection.  As a result of these bankruptcy filings, this Court, rather than the New Jersey state court, will determine ownership.   And, as a result of the state court's order, title to the properties have remained undisturbed while this Court has considered and determined the ownership of the LLCs.

For the reasons set forth above, this Court finds that Licata has failed to prove Mocco acted in bad faith or that Mocco's conduct warrants denial of the Motion to Dismiss.

## II. CONCLUSION

### A. *Conclusions of Law*

1.    Under 11 U.S.C. §§ 1112(b) and 305(a), a chapter 11 petition may be dismissed only "for cause," and may not be dismissed if it was filed in "good faith."  See In re C-TC 9th Ave. P'ship, 113 F.3d 1304, 1311 (2d Cir. 1997).

2.   As the moving party under 11 U.S.C. §§ 1112(b) and 305(a), Mocco bears the burden of making a *prima facie* showing of bad faith.  See RUSSEL, BANKRUPTCY EVIDENCE MANUAL, 2001 Ed., § 301.82(B).  Based on the facts of this case, the Court concludes Mocco has met his burden.

3.   No single factor is determinative on the issue of good faith filing.  The Court must examine the facts and circumstances of each case against established guidelines. See In re C-TC 9<u>th</u> Avenue P'ship, 113 F.3d 1304 (2d Cir. 1997); In re HBA East, Inc., 87 B.R. 248, 259 (Bankr. E.D.N.Y. 1988).

4.   Licata's interest in the subject properties never exceeded that of a nominee. LiButti v. United States, 968 F. Supp. 71, 76 (N.D.N.Y. 1997),[15] aff'd in part and rev'd in part on other grounds, 178 F.3d 114 (2d Cir. 1999).

5.   Since the LLCs were formed under the New Jersey Limited Liability Act and because the operating agreements for the LLCs include choice of law provisions specifying New Jersey law, the LLC Act and case law under that Act are controlling.  See Restatement (Second) of Conflicts of Law § 302 (1971).

6.   The LLC Act establishes default requirements and standards, but provides the LLC members great discretion to establish the company structure and procedures that match their needs.  See Kuhn v. Tumminelli, 2004 WL 239883 at *4 (N.J. Super. Feb. 11, 2004); see also N.J. Stat. Ann. 44:2B-66(a).

7.   The LLC Act does not include mandatory requirements for procedures for determining equitable ownership.  However, it expressly permits the use of share certificates as the controlling evidence of LLC ownership.  See N.J. Stat. Ann. 42:2B-44.

8.   Focusing on the corporate aspect of the LLCs that gave rise to the present controversy over ownership of the LLCs and, therefore, the properties they hold,  established principles and precedent of corporate law control the resolution of this controversy. See David M. Hastings, J.D., Annotation, *Construction and Application of Limited Liability Company Acts*, 79 A.L.R.5th 689, at § 2[a].

9.   Under New Jersey case law, it is not necessary for a stock certificate to be issued to a stockholder to evidence ownership since the certificate is merely the evidence of title, and not the property itself. See Piechowski v. Matarese, 54 N.J. Super. 333, 343 (1959); see also Crouse v. Agorganic, Inc., No. A-5877-01T5, slip op. at 10 (N.J. Super. Sept. 30, 2003); Abraham v. Township of Teaneck Ethics Bd., 349 N.J. Super. 374, 380 (2002).

---

[15] Having found in a proceeding below that New Jersey's substantive law applied, the district court instructed in this case that it found no reported New Jersey cases addressing the factors relevant to the nominee theory.  See LiButti, 968 F. Supp. at 75.  Therefore, it would apply factors used by other courts that have considered the nominee theory.  See id.; Tows Antique Ford Found. v. IRS, 791 F. Supp. 1450, 1454 (D. Mont 1992), aff'd, 999 F.2d 1387 (9th Cir. 1993); Hill v. United States, 844 F. Supp. 263, 271 (W.D.N.C. 1993)).

10    There are no express provisions in the LLCs' respective operating agreements prohibiting the transfer of ownership by means other than the issuance of certificates. The certificate ledgers served as the books and records of the LLCs regarding the recording of ownership of the LLCs. See Hill v. Warner, Berman & Spitz, P.A., 197 N.J. Super. 152, 163 (1984) (citations omitted).

11.    The 3-page agreement is valid and enforceable, based upon principles of promissory estoppel.

12    The execution of the May 1997 Escrow Agreement effectuated the transfer of ownership interest away from Licata because, in conjunction with the execution of the Escrow Agreement, Licata also executed an irrevocable Limited Power of Attorney that bestowed on Pieter de Jong the authority to issue replacement certificates to such person or entity that Mocco designated.

13.    De Jong's September 2001 delivery to Mocco of LLC certificates and records pursuant to the Escrow Agreement further evidenced the transfer of ownership interest away from Licata, the conditions of the Escrow Agreement having been satisfied.

14.    Mocco has met his burden of making a *prima facie* showing that Licata's ownership interests in the LLCs were transferred prior to the LLCs' petition date.

15.    Licata had no ownership interest in the LLCs as of the date he filed the LLC bankruptcy petitions.

16.    Mocco has met his burden of making a *prima facie* showing that the petitions for the LLCs were unauthorized.

17.    Mocco has met his burden of making a *prima facie* showing of "bad faith" in Licata's filing of the LLC's bankruptcy petitions.

18.    The September 21, 2001 New Jersey state court order issued in Peter Mocco et al., v. James Licata et al., No. ESX-C-397-99, did not change the ownership of the properties held in the LLCs.

19.    Since neither Licata nor Mocco disclosed the 3-page agreement to the New Jersey bankruptcy court, Mocco's failure to disclose it is not a basis for denying the relief now sought by Mocco.

20.    Licata has failed to establish fraudulent intent or fraud by Mocco sufficient to deny the Motion to Dismiss.

### B. Summary

Based on the record before it, the Court finds that Licata had no ownership interest in the LLCs as of the date he filed the LLC bankruptcy petitions. Licata's title to the subject properties was always as Mocco's nominee only; the LLCs served merely as a conduit into which Mocco transferred his real property for later reconveyance to him or his designee. This conclusion is bolstered by Licata's own sworn statement in his personal bankruptcy schedules where he indicated he had no ownership interest in these LLCs on the relevant dates. The record of certificate transfers also evidences Mocco's ownership of the LLCs as of September 1,

2001. Neither the alleged bad faith of Mocco nor the state court order demanding surrender of the share certificates deprived Mocco of his ownership rights. Thus, the Court concludes that Licata had not a scintilla of authority to file these chapter 11 cases on behalf of these LLCs.

Independently, and as an alternate ground for granting relief, the Court finds the petitions of the LLCs were filed by Licata in bad faith. There was no legitimate reorganization purpose to be served by the filings. Rather, the Court finds that Licata's primary, if not sole, motivation in filing the LLC bankruptcy cases was to attempt to retain possession and control over property in which he had no ownership rights and distribute the proceeds of this property to his creditors.

Thus, the Court grants the Moccos' Motion to Dismiss.

## C. *Ruling on Requests for Findings and Conclusions*

### (T) Debtors' Proposed Findings of Fact and Conclusions of Law (doc. # 100)

GRANTED *in toto* – 1–3, 5–11, 13-14, 17–24, 26, 28–30, 32–41, 44–48, 51–52, 54,57–60, 63-73, 75, 77–79, 82–86, 89, 93-95, 97, 99–100, 104, 106–109, 111–116, 126-127, 130, 133, 135, 138–149, (A)–(G), (L).

GRANTED with exceptions or caveats (as noted) –

4 (except that Mocco owed First Union approximately $44 million),

12 (first and third sentences only),

16 (first and second sentences only),

25 (without the introductory phrase "Reflecting Licata's and his staff's understanding of the contemplated arrangement,"),

31 (without the introductory phrase "Again reflecting its understanding of the transaction,"),

61 (except that "First Union" should read "First Connecticut"),

62 (except that in the first sentence, "First Union" should read "First Connecticut"),

74 (without footnote 5),

76 (first and second sentences, and third sentence ending after the word "projects"),

88 (first sentence only),

92 (To read: "Licata caused the establishment of limited liability companies, including the subject LLCs, and registered them under New Jersey law."),

101 (excluding last sentence),

103 (excluding last sentence),

131 (with sentence to end after the word "properties"),

132 (with sentence to end after "August 1998").

DENIED[16] – 15, 27, 42–43, 49–50, 53, 55–56, 80–81, 87, 90–91, 96, 98, 102, 105, 110, 117–125, 128–129, 134, 136–137, (H)–(K), (M)–(Y).

(ii) Moccos' Proposed Findings of Fact and Conclusions of Law (doc. # 98)

GRANTED *in toto* – I:1–2, II:1–2, III:1–3, IV:1, 1.1–1.16, 1.18–1.40, 2.1–2.5, 2.7–2.13. 3.1–3.5, 3.7–3.9, 3.11, 4:A–L, 4:N–S, A.1–A.14, A.18, A.20, B.1–B.17A.3, B.17A.6, B17A.8, B18, C.1A, C.1.A.2, C.1.A.3, C.1.B.1, C.1.D, D.1, D.4–10, E.2, E.3, E.9–E.9.4, E.10, E.11, F.2, F.3, G.1-2.A, G.3.

GRANTED with exceptions or caveats (as noted) –

2.6 (except that in the second sentence, the phrase "so long as" is replaced with "after"),

2.14 (with the deletion of the phrase "repeatedly reaffirmed the terms of the three page agreement and"),

3.6 (except that in the second sentence, the introductory phrase "In all the descriptions of the deal," is deleted), 3.10 (first sentence only),

B.17A.4 (first sentence only),

B.17A.5 (excluding the phrase "and moral"),

C.1.C (second and third sentences only),

D.11 (sentence one through three only),

E.1 (excluding the phrase "which as shown above is fallacious"),

E.8 (excluding the introductory word "Conspicuously"),

E.9.5 (except "irregardless" should read "regardless").

DENIED – IV:1.17, 4:M, A.15-A.17, A.19, B.17A.7, C.1A.1, C.1.A.4-C.1.B, C.1.B.2, C.2, C.2.A-C.2.E, D.2, D.3, D.12, E.4-7, E.12, F.1, F.4-7, G.2.B.

This Memorandum of Decision constitutes the Court's findings of fact and conclusions of law.

Dated at Rutland, Vermont this 27th day of July 2004.

Colleen A. Brown
United States Bankruptcy Judge

---

[16] The Court's denial of some findings of fact and conclusions of law – as to both parties – is based upon the proposal being either inconsistent with the evidence, immaterial, or set forth in an inflammatory rather than objective tone.